# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00025-CV

**Appellants, Lakeway Regional Medical Center, LLC and
Surgical Development Partners, LLC// Cross-Appellant,
Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC**

**v.**

**Appellee, Lake Travis Transitional LTCH, LLC
n/k/a Lake Travis Specialty Hospital, LLC// Cross-Appellees,
Lakeway Regional Medical Center, LLC; Surgical Development Partners, LLC;
Brennan, Manna, & Diamond, LLC; and Frank T. Sossi**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-12-000983, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellants Lakeway Regional Medical Center, LLC ("Lakeway") and Surgical Development Partners, LLC ("SDP") (collectively "appellants") appeal from the judgment against them in favor of appellee Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC ("Lake Travis").[1] Lake Travis filed a cross-appeal against Lakeway, SDP, and additional cross-appellees Frank T. Sossi, the attorney who represented Lakeway in the negotiations that led to this litigation, and his law firm, Brennan, Manna, & Diamond, LLC (collectively "the attorneys").

---

[1] The legal entity was initially called Lake Travis Transitional LTCH, LLC and is now known as Lake Travis Specialty Hospital, LLC. References to "Lake Travis" refer to the legal entity.

We reverse the trial court's judgment and render judgment that Lake Travis take nothing in its claims against appellants.

**Factual Background**

In 2004, Robert Berry and Keith McDonald starting planning a long-term acute care hospital[2] that would be known as Lake Travis Specialty Hospital. The hospital was to be 57,000 square-feet in size and was to have forty-six beds. In 2007, they obtained $21 million in financing by way of a ground lease with HCN Interra Lake Travis LTACH, LLC, which was a joint venture between HCN Interra and Health Care REIT, Inc. Shortly before the lease was signed, Berry and McDonald created the Lake Travis legal entity, which entered into the lease as tenant. Construction began in 2008. However, in May 2009, in response to legislative action, Berry and McDonald decided to operate Lake Travis as a general acute care hospital. At that point, HCN Interra started to have concerns about Berry's and McDonald's lack of experience with general acute care facilities.

In 2008, while Lake Travis was proceeding with construction, three doctors and a businessman formed Lakeway with the intent of opening a general acute care facility in the same general area that was planned to encompass 244,000 square feet and have 106 beds. Lakeway hired SDP for assistance with obtaining financing and in opening the hospital. Sometime before mid-April 2009, Lakeway started the process of applying for HUD Section 242 Mortgage Insurance,

---

[2] Patients in a long-term acute care hospital stay more than twenty-five days on average. Patients in general acute care hospitals (also known as short-term acute care hospitals) stay fewer than six days on average. Berry and McDonald had substantial experience with long-term acute care hospitals but did not have experience in general acute care hospitals. Berry and McDonald planned Lake Travis to open as a long-term hospital initially and then transition into a general acute care hospital and to obtain a "general acute care hospital provider number" from Medicare.

which is intended to "assist the provision of urgently needed hospitals" for care of acutely ill patients.[3] *See* 12 U.S.C. § 1715z-7(a). On April 16, 2009, HUD informed Lakeway that it had conducted a preliminary review and had identified no problems that would stop HUD from proceeding to a pre-application meeting, stated that Lakeway had to submit a complete application within one year, and assigned Robert Deen to be the project's HUD Account Executive. Deen's role was to "lead the team that will review the application for mortgage insurance" and to be Lakeway's contact person at HUD.

Meanwhile in 2009, Congress began discussing banning physician-owned hospitals, and Lakeway began exploring contingency plans that would allow it to open its facility before the ban took place.[4] Sossi then contacted a business contact who worked for Health Care REIT to ask about the Lake Travis facility and whether Lakeway might be able to use that facility as a first campus so that Lakeway might avoid the ban on doctor-owned structures. During those conversations, Sossi learned that Health Care REIT had concerns about Berry's and McDonald's experience and that HCN Interra was hoping to replace Lake Travis as tenant in the project. Lakeway decided to explore whether the Lake Travis facility, which was already under construction, could serve as its initial facility while its larger facility was built.

---

[3] *See generally* 12 U.S.C. § 1715z-7 ("Mortgage insurance for hospitals"); 24 C.F.R. §§ 242.1-.93 ("Mortgage Insurance for Hospitals"). Part of the HUD review process involves "a determination of the market need" for the hospital and whether the area is considered underserved by current facilities and services, which requires evaluation of current facilities, the number and percentage of any excess beds, and demographic projections. 24 C.F.R. § 242.16(a)(1). "Generally, Section 242 insurance may support start-up hospitals or major expansions of existing hospitals only if existing hospital capacity or services are clearly not adequate to meet the needs of the population in the service area." *Id.*

[4] The ban passed and took effect in early 2010.

In May 2009, SDP and Lake Travis signed a confidentiality agreement so that SDP could start due-diligence work on behalf of Lakeway. In September 2009, SDP, Berry, and McDonald signed a "Letter of Intent for the Acquisition of the Lakeway Hospital Lease" ("Letter of Intent"); SDP signed as Lakeway's agent. The Letter of Intent was intended "to indicate SDP's interest in the Project," defined as Lakeway's acquisition of the Lake Travis lease, use of the facility as an initial campus, and later use of the facility as a satellite location after its main campus was completed, and to set "ground rules" for the exchange of information related to the Project. The parties agreed to an extendable forty-five day period of negotiations and evaluation, and while the Letter of Intent was in effect, Berry and McDonald agreed not to enter into negotiations with another party for the assignment of the lease, and Lakeway agreed not to "enter into negotiations with any third party for the use of any site, other then [sic] the intended [Lakeway] main campus site, as an alternative or satellite facility." The parties also agreed "not to share any information with third parties gained in the negotiation and development process for the Project or to independently use any proprietary information of the other Party in any discussions or negotiations regarding this Project with third parties after the acceptance of this Letter of Intent"; "proprietary information" was defined as "all information disclosed by any Party or its Representatives at any time to any other Party or its Representatives in connection with the Project in any manner," with certain specific exceptions, and was only to be used to evaluate the feasibility of the Project.

Section 2 of the Letter of Intent stated that Lakeway "will assume the existing Lease between [Lake Travis] and [HCN Interra] and become the tenant under the Lease." Section 2 also stated that upon closing of the assignment of the lease, Lakeway would refund to Berry and McDonald the deposits and other reasonable costs associated with developing the facility (about

4

$6.4 million in total) and would pay Berry and McDonald an additional $1.5 million lump sum payment. Section 3 stated that the terms of Section 2 were subject to full and formal approval by Lakeway's board, HCN Interra's approval, a due-diligence process to ensure the facility could be used as contemplated, Lakeway's ability to obtain financing, and "the mutual development of definitive documents that fully reflect the intention of the Parties expressed in this Letter of Intent."

On March 17, 2010, HUD issued a commitment approving financing for Lakeway's facility as originally planned. On March 22, 2010, Sossi sent Lake Travis's representative an email stating that Lakeway had decided not to acquire the Lake Travis lease due to concerns about "what to do with the facility after the opening of [Lakeway's main campus] as well as any issues related to HUD delaying or not allowing the merger with" Lakeway. On April 30, Lakeway sent HUD a letter asking for amendments to the HUD commitment, seeking a better interest rate and lower Level Annuity Monthly Payment, among other changes.

On May 8, 2010, Rip Miller, chairman and CEO of The Hospital at Westlake Medical, sent HUD an email asking why HUD was guaranteeing Lakeway's mortgage "when there is a similar private hospital about ½ mile away, . . . about 90% completed and scheduled to open this summer." He also said Lake Travis would "be in direct competition to your guaranteed project" and that the "area is clearly NOT underserved." Robert Deen then sent Sossi an email stating that HUD had been told that "a new Lakeway Hospital, built with all private funds, will be opening in a few months and will be in direct (acute care general hospital) competition with the Lakeway Regional Medical Center" and that the area thus should not be considered underserved. Deen asked Sossi to tell him "[a]nything you can tell me about the Hospital," including whether it was "really an acute

5

care hospital," the hospital's name, owners, and size, its development history, its financing, whether it was likely to open in the summer of 2010, and information about its medical staff.

On May 10, 2010, in the email that formed the basis of Lake Travis's claims, Sossi replied that the Lake Travis facility was designed as a long-term acute care facility but "missed the moratorium dates and has recently been discussed as a potential acute care." He said that Lakeway had investigated using the facility as a "jump start" while its main facility was built but had decided against it for several reasons. He said that Lake Travis was "designed as [a long-term acute care hospital] with 2 OR's in the basement," that the structure was "very small and has numerous code issues related to the construction and design," that the "46 bed level would be very difficult to expand without changing the entire nature of the development," that it lacked adequate parking, and that its conversion from "a residential facility to a true acute care will cost a great deal of money." Sossi said that Lakeway was "not aware of any formal request to the City of Lakeway for a zoning change or the needed parking, traffic, or other impact studies that would be required for the conversion process" and that attempts to rezone the property would be challenged. He also explained that "when the questions related to any other suitable sites for [Lakeway] were raised with the City of Lakeway the answer was that ONLY the [Lakeway] site had proper zoning." As for whether the area was "underserved," Sossi answered, "Lakeway is underserved and this [Lake Travis long-term acute care] facility will not change that in a material manner." Sossi then provided information about the facility's name and its development history (a joint venture between HCN Interra and Healthcare REIT); stated that it would have forty-six beds and two small operating rooms and that it had "[l]imited imaging and major design issue[s]" for an acute care facility; stated that Lake Travis was "to be structured as a 100% interest only lease"; estimated the annual lease

6

costs to be $3.5 million, "which appears to be prohibitive for the facility"; said he did not believe the facility would open in the summer of 2010 because it had "no operator on the horizon—no staff—just starting to shop it"; and said he was not aware that Lake Travis had any medical staff—"there was no list of interested physicians in the facility—some discussion of a group that may have an interest" in developing a free-standing clinic or center on the campus. Sossi concluded, "Our issue with the facility was the ability to work out all the design issues, the need for major retro fits to get it to open, the lack of physician interest for the facility, the zoning issues to allow the conversion to acute care status and what to do with the facility when [Lakeway] opens. The costs and technical problems of conversion made the facility inappropriate to help [Lakeway] or to be able to succeed as a separate facility."

On May 20, HUD issued amendments to the Lakeway commitment. Lakeway's HUD-insured loan closed on May 21, 2010, and it opened to the public in April 2012. Meanwhile, Berry and McDonald unsuccessfully sought out other investors for the Lake Travis project. McDonald died in 2011, and Berry never located a partner with the general-acute-care experience HCN Interra was requiring. Lake Travis eventually defaulted on its loan payments, and HCN Interra terminated the lease in 2012.

In April 2012, Lake Travis, as assignee of Berry and McDonald's estate, filed suit. Lake Travis asserted claims for negligent misrepresentation, breach of contract, and misappropriation of trade secrets against Lakeway and SDP. Against the attorneys, it asserted claims for misappropriation of trade secrets and negligent misrepresentation. The parties filed competing motions for summary judgment. The trial court granted summary judgment for the

7

attorneys on all of the claims against them.[5]  It also granted summary judgment for Lakeway and SDP on the following claims:  misappropriation of trade secrets, breach of Section 2 of the Letter of Intent, and three of the five allegations of negligent misrepresentation.  The case proceeded to trial on Lake Travis's remaining breach of contract and negligent misrepresentation claims against appellants.  The jury returned a verdict finding that appellants had not committed negligent misrepresentation but had breached the Letter of Intent[6] and awarded Lake Travis $7,900,000 in "loss of fair market value" damages for the breach of contract.[7]

Appellants assert that the evidence is legally and factually insufficient to show that any breach of contract caused Lake Travis to suffer damages.  They further argue that the evidence is legally and factually insufficient to support the jury's damage award; that Lake Travis only presented evidence of its own alleged damages, not damages suffered by Berry and McDonald, the signatories to the Letter of Intent; and that Lake Travis, as assignee of Berry and McDonald's rights, was limited to damages suffered by Berry and McDonald.  Appellants contend in the alternative that there was a *Casteel* error in the jury charge that requires a new trial.  *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000).  Finally, SDP argues that the judgment against it must be reversed because (1) as Lakeway's agent, it was not a party to the Letter of Intent, (2) the jury was

---

[5] The trial court granted summary judgment for all the defendants on Lake Travis's claims for negligent misrepresentation and misappropriation of trade secrets.  Lake Travis later nonsuited its participatory liability theories against the attorneys, disposing of all claims against the attorneys.

[6] Lake Travis alleged in its live pleading that appellants had breached the Letter of Intent in several ways, but the only breach alleged and discussed on appeal concerns Sossi's May 2010 communications with HUD about the Lake Travis facility, which the parties seem to agree violated the Letter of Intent's confidentiality clause.

[7] The jury found that Lake Travis should receive no lost-profits damages.

not asked whether SDP was a party to the Letter of Intent, and (3) the evidence was insufficient to show that SDP breached a duty that caused Lake Travis any damages.

Lake Travis cross-appealed, arguing that the trial court improperly granted summary judgment for all cross-appellees on its misappropriation-of-trade-secrets claim and on its claim that Lakeway and SDP breached Section 2 of the Letter of Intent. It further contends that the trial court abused its discretion in sustaining objections to some of Lake Travis's summary judgment evidence.

We disagree with Lake Travis's contention that the trial court improperly granted summary judgment on its claim that Section 2 was binding. We agree with appellants that the evidence is insufficient to show causation between Sossi's communications and Lake Travis's asserted damages, and our resolution of that issue is dispositive of the remaining issues on appeal.

**Standard of Review**

Evidence is legally insufficient to support a jury's verdict if there is a complete absence of evidence of an essential finding, the only evidence to support an essential finding cannot be considered, no more than a scintilla of evidence supports an essential finding, or the evidence conclusively establishes the opposite of the essential finding. *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011); *Barry v. Jackson*, 309 S.W.3d 135, 139 (Tex. App.—Austin 2010, no pet.); *see Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 313 (Tex. 2015) (appellate court should sustain legal-sufficiency challenge if finding is supported by no more than scintilla of evidence). "[W]e consider the evidence and reasonable inferences tending to support the finding and disregard contrary evidence and inferences." *Melendez*, 477 S.W.3d at 313 (citing *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001)). However, the jury may not infer an ultimate fact from

9

scant circumstantial evidence that could give rise to a number of other equally probable inferences. *Hancock v. Variyam*, 400 S.W.3d 59, 70-71 (Tex. 2013) (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)). In conducting a factual sufficiency review, we consider all of the evidence and will overturn a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Smith v. East*, 411 S.W.3d 519, 529 (Tex. App.—Austin 2013, pet. denied). The jury is the sole judge of witness credibility and the weight to be given to the testimony, and we will not disturb its resolution of evidentiary conflicts that turn on credibility determinations or the weight of the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Barry*, 309 S.W.3d at 139. If the evidence is factually insufficient, we must detail relevant evidence and explain why the jury's determination is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly show bias. *Jackson*, 116 S.W.3d at 761.

### Causation

Appellants argue that the evidence is legally and factually insufficient to support a finding that Sossi's communications with HUD about the Lake Travis facility caused Lake Travis to suffer damages. Specifically, they assert that the evidence is insufficient to show that those communications caused HUD to decide to insure Lakeway's loan. We agree.

To recover damages, "a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant." *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex. 1995). The evidence must establish a "direct causal link" between the misconduct, the plaintiff's injury, and the damages awarded. *Id.*

10

"Consequential damages are 'those damages which result naturally, but not necessarily from the acts complained of.'"[8]  *Id.* at 182 (quoting *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex. 1992)).  Although consequential damages need not be the usual result of the misconduct, they must be foreseeable, directly traceable to the wrongful act, and the result of it.  *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997).  Damages that "are too remote, too uncertain, or purely conjectural" are not recoverable.  *Id.*  "[T]he burden is on the plaintiff to produce evidence from which the jury may reasonably infer that the damages claimed resulted from the defendant's conduct."  *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997).

In this case, the allegation was that appellants' breach of the confidentiality clause caused Lake Travis to suffer $7,900,000 damages in "loss in fair market value."[9]  Lake Travis had the burden of producing evidence from which the jury could find (1) that appellants' disclosure of confidential information caused HUD to guarantee Lakeway's mortgage, and (2) that HUD's mortgage guarantee led to the destruction of Lake Travis's business prospects.

No one from Lakeway or SDP provided any information to HUD about Lake Travis before HUD made its commitment to guarantee Lakeway's mortgage on March 17, 2010.  *See* 24 C.F.R. § 242.17 ("Upon approval of an application for insurance, a commitment *shall be issued* by HUD setting forth the terms and conditions under which an insurance endorsement *shall be issued* for the hospital." (emphasis added)).  Deen testified on written questions and stated that he was

---

[8]  The other kind of damages are direct damages, which are "the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong."  *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997).

[9]  The damages awarded by the jury for "loss of fair market value" fall into the category of consequential damages, not direct damages.

11

HUD's "lead account executive assigned to develop the client service team report and recommendation," and that he had "asset management responsibilities for the project." Deen testified that in March 2009, during its underwriting process, HUD found a newspaper article about "Lake Travis Transitional Hospital's development (at the time it was called Lake Travis Speciality Hospital)" that described the intended facility as "a long-term acute care hospital, not a general acute care hospital." Berry was quoted in the article "as saying that the hospital will have a 24-hour emergency room and would care for long-term acute patients who are recovering from traumatic injury or serious medical condition and need 25 or more days in the hospital." On April 30, 2010, Lakeway requested amendments to HUD's guarantee. In May, after Miller questioned whether the area was underserved, HUD located another article about Lake Travis and sent Sossi its questions. Sossi responded, and Deen spoke to other people associated with Lakeway or SDP to verify the information provided by Sossi.[10] HUD issued the amendments requested by Lakeway on May 20, and the deal closed the next day.

Lake Travis did not produce any evidence that HUD considered revoking its commitment after receiving Miller's letter.[11] Nor did it produce any evidence that Sossi's

---

[10] Deen testified that in June 2010, Sossi spoke to another HUD representative and an Assistant U.S. Attorney about Sossi's understanding of Lake Travis's licensing status, but the record contains no other information about the substance of that conversation.

[11] Lake Travis asserts that the "initial commitment [was] not binding" and that HUD could have rescinded its commitment due to Lakeway's failure to disclose Lake Travis as a competitor, citing Title 12, Section 1709(e) of the U.S.C. as support. Section 1709(e) provides that a contract of insurance is conclusive evidence of the mortgage's eligibility for insurance and that a mortgagee's contract for insurance is incontestable except for cases of fraud of misrepresentation by the mortgagee. 12 U.S.C. § 1709(e). However, the record contains no indication that anyone at HUD believed Lakeway had made any misrepresentations in the application process. In June 2010, Lake Travis sent HUD a letter objecting to HUD's guarantee of Lakeway's mortgage and informing

12

May 10 email had any effect on HUD's decision-making process. At the time HUD committed to guaranteeing Lakeway's mortgage, it knew about the Lake Travis facility as approved by the City of Lakeway—a long-term acute care facility with forty-six beds and two operating rooms. Further, the majority of information provided by Sossi on May 10 was public knowledge, as shown by two newspaper articles written in February 2009. The first stated that Lake Travis planned to open a hospital in December 2009, and quoted Berry as saying that the hospital was "licensed as an acute care hospital" but would focus on "patients who will have lengths of stay greater than 25 days." The article described the facility as having 2,700 square feet for emergency services and "40 medical-surgical and six intensive care beds," and quoted Berry's description of the needs of a typical patient of "a long-term, acute care hospital." The other article stated that Lake Travis planned to begin "taking its first long-term, acute-care patients in February 2010" and that Lakeway was "expected to open in 2011 as an acute-care general hospital with 70 to 80 licensed beds and 25 ER beds." In

---

HUD that "Lake Travis is an acute care hospital located approximately *one-half* mile from the future site of [Lakeway] and is slated to open in the fall of 2010—two years *before* [Lakeway] is expected to be complete. Lake Travis will serve the community in direct competition with the for-profit [Lakeway] project that HUD is using taxpayer dollars to guarantee." They went on to assert that the area is not underserved and that HUD appeared to have made its decision "based on incomplete and inaccurate information." If HUD felt that Lakeway had made any misrepresentations in its application, it could have revoked the guarantee, but it did not do so and instead defended its decision, thus indicating that Lakeway had not made misrepresentations in the process.

Further, it would seem that had Lakeway more fully disclosed Lake Travis's plan to change to a general acute care structure, as Lake Travis seems to argue it should have, Lakeway would have been providing information learned during the negotiations, again running afoul of the confidentiality clause. Finally, Lake Travis disclosed much of the same information when it objected to the HUD guarantee. The only information Sossi provided that was not either public knowledge or disclosed by Miller or Lake Travis itself were Sossi's annual lease estimate, his belief that Lake Travis was not yet staffed and would not open in the summer of 2010, and his explanation that Lakeway opted against acquiring the lease because of retrofitting costs and complications, zoning issues, and concerns about how to use the facility after Lakeway's main campus opened.

that article, Berry stated that Lake Travis was "aimed at patients who have suffered a traumatic injury and are recovering or have some other serious medical problem and need at least 25 days or more in the hospital" and that he did "not see [Lake Travis] as competing with the planned regional medical center [Lakeway], which will be a mile or so away." Appellants also produced an April 2, 2009 newspaper article reporting that Lakeway's talks with Lake Travis had fallen through and quoting a Lakeway board member's explanation that the Lake Travis facility "wasn't built as an acute-care facility that would meet [Lakeway's] needs" and that Lakeway's "architects and engineers couldn't make it work as an acute-care facility." In that article, Berry stated that Lake Travis "will have to shift its designation as a long-term acute care (LTAC) center to an acute-care provider because of a three-year Medicare moratorium on new LTACs that won't expire until the end of this year." Berry explained that the "biggest difference in facility types" was that "Medicare patients would not be required to have a 25-day length of stay or greater to be reimbursed."

Lake Travis called as a witness Dr. Gary Lacefield, who worked for HUD for about ten years, leaving in 1999. Lacefield testified that if Sossi had responded to HUD's questions by simply telling HUD to seek answers from Lake Travis directly, HUD would have been required to complete a full review. Had HUD done a full review, he opined, it would have decided that the Lakeway project was not worthy of a HUD hospital loan mortgage because five or six other hospitals within a twenty-five mile radius should have been listed as competition. Lacefield did not testify about the HUD commitment process or how and when a commitment can be revoked, and on

14

cross-examination, he was challenged as to his knowledge of the Section 242 program and whether a patient should have to drive twenty to twenty-five miles to access emergency care.[12]

The question is not whether the HUD guarantee gave Lakeway a competitive advantage or made the Lakeway project possible at all; there is no dispute that it did. The question is whether Sossi's disclosures on or about May 10, 2010 caused HUD to guarantee the loan, and there is no evidence of that fact. HUD had already reviewed Lakeway's application and decided to guarantee the mortgage despite knowing that Lake Travis was under construction. When Miller challenged HUD's determination that the area was underserved, HUD asked Sossi follow-up questions related to Lake Travis, received information that was largely already in the public domain, and left its commitment decision unchanged. There was no evidence that HUD started to second-guess its initial commitment after receiving Miller's email about Lake Travis. There is no evidence that Sossi's responses to Miller's concerns affected the process at all. HUD had issued its commitment months before Sossi's email and was asked by Lakeway on April 30 to make certain amendments. Twenty days after receiving that request, it decided to do so. The fact that the commitment's closing date was also within about a week of Sossi's email to Deen does not give rise to an inference that Sossi's email caused HUD's decision.

A jury may not infer "an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'" *Hancock*,

---

[12] Further HUD reviews conducted after the dispute arose all determined that the area was underserved, and the Mayor of the City of Lakeway wrote two letters, one in December 2009 and one in June 2010, strongly advocating the need for a new, large hospital. He explained that getting from the Lakeway area to the hospitals in Austin, most of which are between sixteen and twenty miles away, can take thirty minutes, which can be a life-threatening delay in an emergency.

400 S.W.3d at 70-71 (quoting *Edwards*, 958 S.W.2d at 392). In *Hancock*, plaintiff Variyam asserted that the jury could infer that a letter written by the defendant damaged his reputation with an accreditation board. *Id.* at 70. The supreme court disagreed, holding, "Here, there were multiple possible grounds for the accrediting body denying accreditation . . . , but Variyam offered no evidence that the inference regarding the letter was more probable than other possible inferences." *Id*. at 71. Similarly, here there were multiple reasons why HUD might have decided not to revoke its commitment to insure Lakeway's mortgage, and Lake Travis offered no evidence that the inference regarding Sossi's letter was more probable than other possible inferences. *See id.* at 70-71. Thus, the jury's conclusion that HUD's decision must have been influenced by Sossi's email was an improper inference in violation of the equal-inference rule. *See id.*; *see also Burbage v. Burbage*, 447 S.W.3d 249, 262 (Tex. 2014) ("the jury cannot reasonably infer that defamation caused the cancellations when the cancellations could have occurred for any number of reasons").

We hold that the evidence is legally insufficient to show that Sossi's communications to Deen in May 2010 caused HUD to guarantee Lakeway's mortgage. *See Guerra*, 348 S.W.3d at 228. We sustain appellants' first issue on appeal.[13]

---

[13] We further note that the evidence does not support the $7.9 million award for "loss of market value." Consequential damages are not recoverable "unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach." *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998) (per curiam). "[T]o be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it." *Id*. Thus, Lake Travis may not recover loss-of-fair-market-value damages unless it can show that at the time the parties entered into the Letter of Intent, the destruction of Lake Travis's viability as a business prospect was the natural, probable, and foreseeable consequence of a breach of the confidentiality clause, and the record does not include evidence of that. The parties' inclusion in the Letter of Intent of a remedies clause stating that "material and irreparable harm shall be presumed" in the event of a breach is not evidence of foreseeability or the parties' contemplation of such tenuous damages, and

16

On cross-appeal, Lake Travis asserts that the trial court erred (1) in determining that Section 2 of the Letter of Intent was not binding, (2) in granting summary judgment against it on its claims for misappropriation of trade secrets, and (3) in sustaining objections to some of its summary judgment evidence. We first address Lake Travis's arguments related to Section 2.

As we stated earlier, Section 2 of the Letter of Intent stated that Lakeway "*will assume*" Lake Travis's Lease and that Lakeway would pay Berry and McDonald a total of $7.9 million for deposits, costs associated with developing the facility, and a $1.5 million lump sum payment. (Emphasis added.) Lake Travis argues that Section 2 was a binding agreement, contained all essential terms, and was "more than an agreement to agree." However, Section 3 explained that Section 2's provisions would only take effect if Lakeway's board approved, HCN Interra approved, a due-diligence investigation showed that Lakeway's proposed use of the facility would be feasible, Lakeway could obtain financing, and the parties developed "definitive documents" reflecting their intention as expressed in the Letter of Intent. Further, the Letter of Intent specified that its objective was to indicate Lakeway's and SDP's interest in having Lakeway take over Lake Travis's lease to use the facility as an initial campus until its main campus was completed. The Letter of Intent was made effective for an initial forty-five day period, subject to extension, and Berry and McDonald agreed not to negotiate with other parties while the Letter of Intent was in effect.

It is well-established that when interpreting a contract, we seek "to ascertain and give effect to the intent of the parties as that intent is expressed in the contract," and that "[t]o discern this

Lake Travis did not produce other evidence that would support its recovery of the consequential damages awarded by the jury. *See id.*

intent, we 'examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.'" *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Applying that bedrock rule to this case, despite the affirmative language that Lakeway "will" take over the lease and pay Berry and McDonald $7.9 million, when read in its entirety, the Letter of Intent clearly was not intended by the parties to be a final and binding agreement for Lakeway to assume Lake Travis's lease; it was a binding agreement governing the terms under which the parties were to negotiate and discuss whether Lakeway would assume the lease.

The Letter of Intent did not merely leave pending the "formalization of the agreement of negotiation of ancillary terms," *see Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 692 (Tex. App.—El Paso 2015, pet. denied), but instead specifically stated it was intended as a framework within which the parties would evaluate whether the Lake Travis facility would meet Lakeway's needs and whether they could reach mutually agreeable terms. The Letter of Intent was to be in effect for forty-five days, and at the conclusion of that period, the parties could either agree on an extension or negotiate with other parties. As in *Karns*, the Letter of Intent conditioned Lakeway's assumption of the lease on "completion of a final agreement," an agreement which did not come to fruition. *See id.* at 693-94. We overrule Lake Travis's second issue on cross-appeal.

As for Lake Travis's first issue, asserting that the trial court improperly granted summary judgment on its misappropriation-of-trade-secrets claim, and its third issue, arguing that

the court improperly sustained objections to some of its summary judgment evidence, our resolution of Lakeway's arguments related to causation renders those issues moot.

To recover for misappropriation of trade secrets, a plaintiff must show "(1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied). The plaintiff must show that the defendant's misappropriation proximately caused the plaintiff's asserted damages. *See Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 21-22 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Lake Travis asserts that the trade secrets it provided were in the form of architectural plans, mechanical or electrical specifications, plat maps, financial information, staff recruitment information, projected feasibility studies, information learned through site inspections and meetings, and the like. However, even if we assume that Lake Travis provided Lakeway, SDP, and the attorneys with trade secrets, that a confidential relationship was breached, and that a trade secret was used or disclosed improperly, we have already held that Lake Travis did not show a sufficient causal link between Sossi's communications about Lake Travis and HUD issuing its mortgage guarantee, which allegedly caused Lake Travis's damages.[14] Without that causal link, Lake Travis cannot succeed on a claim for misappropriation of trade secrets. We need not decide whether the trial court

---

[14] Lake Travis points to an affidavit by Berry to explain the trade secrets alleged to have been misappropriated and misused. In that affidavit, however, Berry asserts that the information Sossi gave HUD about Lake Travis's progress in its transition to a general acute care facility was false. Lake Travis's evidence therefore puts it in the awkward position of alleging that Sossi improperly disclosed its confidential information but that the communications were false (and therefore could not have consisted of Lake Travis's confidential information).

19

abused its discretion in striking certain items of Lake Travis's summary judgment evidence because, even if the court should have considered the evidence and should not have granted summary judgment on the misappropriation claims, those issues are mooted by our determination that the evidence is legally insufficient to show a causal link between the disclosure and the guarantee.[15]

Similarly, even assuming the trial court abused its discretion in sustaining Lakeway's objections to Lake Travis's "project file," which was produced as summary judgment evidence to show Lakeway's misappropriation of Lake Travis's proprietary and trade secret information, and even if summary judgment was improperly granted on those claims, the lack of causation evidence produced at trial renders the issue moot. We overrule Lake Travis's first and third issues on cross-appeal.

## Conclusion

Lake Travis did not produce more than a scintilla of evidence establishing that Sossi's communications to HUD about Lake Travis's facility and status caused HUD to follow through on its already established plan to insure Lakeway's mortgage. We therefore reverse the trial court's judgment on the jury's verdict and render judgment that Lake Travis should take nothing from

---

[15] Lake Travis argues that it raised a fact issue as to damages measured both in terms of loss of market value and royalty damages. However, the only alleged disclosures were made to HUD, which means the only damages Lake Travis could seek would have to be related to those communications and HUD's decision to continue to insure Lakeway's mortgage. Lake Travis's recovery for any kind of damages relies therefore on its establishing that Sossi's communications with HUD caused HUD to insure Lakeway's mortgage, but we have held that there is no evidence of that essential fact. Thus, Lake Travis cannot show its possible entitlement to damages, whether asserted as royalty or loss-of-market-value damages.

Lakeway and SDP. As for the cross-appeal, we affirm the trial court's granting of summary judgment in favor of Lakeway, SDP, and the attorneys.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed; Reversed and Rendered

Filed:   July 1, 2016